IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AMANDA D. ANDRUS-KARKER,

       Plaintiff,

                              6:13-CV-2134-PK

                              FINDINGS AND
v.                              RECOMMENDATION


CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

_____

PAPAK, Magistrate Judge:

       Plaintiff Amanda D. Andrus-Karker filed this action December 3, 2013, seeking judicial

review of the Commissioner of Social Security's final decision denying her application for

supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act").

This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

       Now before the court are Andrus-Karker's petition (#1) for judicial review and the

Commissioner's motion (#21) for remand of Andrus-Karker's claim to the Administration for further proceedings. It is Andrus-Karker's position that by erroneously rejecting or failing to consider medical evidence and by erroneously rejecting lay evidence of her impairments, the Commissioner failed properly to assess her residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason failed to carry her burden at step five of the process. In consequence, Andrus-Karker argues, this court should reverse the Commissioner's decision and remand for award of benefits. The Commissioner largely concedes Andrus-Karker's various assignments of error, but argues that this court should instead reverse and remand for further proceedings. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's motion for remand should be granted and Andrus-Karker's action should be remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098

(9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

claimant's age, education, and work experience to determine whether a person with those

characteristics and RFC could perform any jobs that exist in significant numbers in the national

economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g),

416.960(c), 416.966. If the Commissioner meets her burden to demonstrate the existence in

significant numbers in the national economy of jobs capable of being performed by a person with

the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the

claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits

if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see*

*also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent

findings of fact in determining whether the ALJ's findings are supported by substantial evidence

of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery

Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is

immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d

1450, 1453 (9th Cir. 1984).

### SUMMARY OF ADMINISTRATIVE RECORD[2]

Andrus-Karker was born December 4, 1992. Tr. 20, 117, 145, 165, 167, 241.[3] She

graduated high school with a modified diploma in 2011, having been in a special education

program continuously from first through twelfth grade. Tr. 31, 42, 165-166, 203, 241-352. In

February 2011, while Andrus-Karker was still in high school, school psychologist Barbara

Keyworth evaluated Andrus-Karker's cognitive abilities through a WAIS-III IQ test and a WIAT-

II individual achievement test. Tr. 255-259. Keyworth concluded that Andrus-Karker had a

verbal IQ of 80 (low average), a performance IQ of 78 (borderline), and a full scale IQ of 76

(borderline). Tr. 256. She further concluded that Andrus-Karker performed in the borderline

range on word reading and in the low average range on reading comprehension and pseudoword

reading (with a borderline-range reading composite performance), in the extremely low range on

numerical operations and math reasoning (extremely low range for math composite), and in the

---

[2] The following recitation constitutes a summary of the evidence contained within the
Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 12.

extremely low range for written expression. Tr. 257-259. Keyworth concluded that
Andrus-Karker's "cognitive ability [wa]s in the Borderline range compared to same-age peers,
suggesting that she may experience difficulty in keeping up with her peers in a wide variety of
situations that require age-appropriate thinking and reasoning abilities. Her academic skills
[we]re in the Borderline-Extremely Low range when compared to same-age peers." Tr. 259.
Keyworth further concluded that "[i]t appears that [Andrus-Karker] will continue to require a
great deal of support and supervision to develop functional vocational skills and independent
living skills." Tr. 259.

According to the evidence of record, Andrus-Karker worked as a dorm-room cleaner for
the Galt Foundation for a portion of mid-2011, Tr. 125, 136, earning a total of $406, Tr. 125,
137. Andrus-Karker has variously indicated that she ceased working as a dorm-room cleaner in
2011 because it was a temporary job only and its term came to an end, Tr. 130, 136, and because
of difficulties with the bus schedule she relied upon to get to work, Tr. 169. Andrus-Karker
expressly does not take the position that she stopped working as a dorm-room cleaner due to her
claimed disability. Tr. 130.

On June 23, 2011, Andrus-Karker protectively filed an application for supplementary
security income benefits, claiming a disability onset date of January 1, 2000 (at which date she
was seven years old). Tr. 64, 82-85, 145-147, *see also* Tr. 31. The disabling condition Andrus-
Karker claimed in connection with her SSI application was "Learning disability." Tr. 130.
Andrus-Karker characterized the impairments caused by her learning disability as limiting her
ability to work  because she is "slow at learning," "get[s] confused easily," "pos[s]ibly
d[y]slexic," and has a "short at[t]ention span." Tr. 148. In connection with her application,

Page 7 - FINDINGS AND RECOMMENDATION

Andrus-Karker reported that she lived in an apartment with her parents and siblings, Tr. 148, and that her daily activities included eating breakfast, taking a shower, going outside, hanging out with her friends, swimming, going bike riding, eating dinner, and going back outside until she needed to return indoors, Tr. 149. She reported that she fed and groomed the family pets and changed their litter boxes. Tr. 149. She reported no difficulties with personal care, but that she did not regularly prepare her own meals due to the dangers presented by the hot stove. Tr. 150. She reported that she performs housework such as cleaning dishes and doing laundry, but that she chose not to drive a car. Tr. 151. She reported that she did not handle her own money. Tr. 152. She reported interests in sports, biking, swimming, playing video games, TV, hanging out with friends and bowling at the mall, and indicated that she rode her bike and played sports daily. Tr. 152. She reported limitations in memory, completing tasks, concentration, understanding, and following written instructions, but indicated that she was "great" at following spoken instructions. Tr. 153. She similarly indicated she was "great" at getting along with authority figures. Tr. 153. She reported that she was "OK" at following a written recipe and "good" at following an orally transmitted recipe. Tr. 153. Andrus-Karker's grandfather James A. Karker provided a function report consistent with Andrus-Karker's self-report, except that he opined that she was "not very good" at following spoken instructions. Tr. 156-163.

Andrus-Karker received vocational training and an evaluation from the Office of Vocational Rehabilitation Services ("OVRS") in August and September 2011, Tr. 169-173, in connection with which she worked in a food room, worked in a retail store, and performed data entry in an office environment for the Society of St. Vincent de Paul, Tr. 170, *see also* Tr. 32-33, earning a total of $510, Tr. 125. In October 2011, OVRS counselor Heather Lindsey provided an

Page 8 - FINDINGS AND RECOMMENDATION

evaluation of Andrus-Karker's performance in those positions. Tr. 169-173. Lindsey noted that, in addition to the employment history recited above, Andrus-Karker had "worked many volunteer jobs, including Greenhill Humane Society, Goodwill, Food for Lane County, Next Step Recycling, and First Place Family Day Care Center." Tr. 169. Lindsey indicated that for the food room Andrus-Karker assisted in sorting and distributing food and school supplies, assisted in clean-up and inventory, and packaged dog and cat food, that for the retail store Andrus-Karker assisted in displaying, organizing, and sorting products on shelves, organized clothing by size, and distributed clothing to appropriate store locations, and that in the Social Service Office Andrus-Karker entered data into an Excel spreadsheet. Tr. 170. Lindsey opined that Andrus-Karker's job duties in connection with all three positions "appeared to be within [her] physical and mental capabilities." Tr. 170.

Lindsey further opined that Andrus-Karker performed at community standard in attendance, punctuality, dressing in appropriate clothing, personal hygiene, personal habits, following instructions, accepting correction, working as a team, staying in her own work area, taking only appropriate breaks, supervisor relations, co-worker relations, motivation, and stamina, and at a 2 out of 5 (where 3 is the community standard) in independent work and staying on task. Tr. 170-172. Lindsey opined that Andrus-Karker performed at below the community standard in productivity and quality overall, although her work in the food room did meet the community standard. Tr. 172. Lindsey opined that Andrus-Karker "demonstrate[d] many strengths to offer an employer," characterizing her as "reliable and punctual[,] . . . always ready to start and learn something new and complete tasks to the best of her ability." Tr. 172. Lindsey described Andrus-Karker as "demonstrat[ing] great flexibility and a willingness to learn any task

Page 9 - FINDINGS AND RECOMMENDATION

as assigned," and as "resilien[t]" and marked by a "desire to succeed." Tr. 172. Lindsey further

opined that Andrus-Karker's "productivity and quality [we]re not competitive[,] . . . due to her

inexperience in work as well as her Learning Disability and [unspecified] barriers to

employment." Tr. 173. Lindsey opined that Andrus-Karker "d[id] not perform as well in a[n]

independent setting, benefitting from work in a team setting." Tr. 173. Lindsey recommended

that Andrus-Karker "look for work that is repetitive and [in which] speed can be increased over

time," and opined that she would "benefit from Supported Employment services for ongoing job

coaching and retention." Tr. 173.

In October 2011, Andrus-Karker was examined by psychologist Alison Prescott at the

request of Disability Determination Services. Tr. 203-209. According to Prescott's report,

Andrus-Karker reported that she had "never had mental health counseling or problems with

depression or anxiety," although she had experienced "severe anger problems when she was

young" that had "gotten much better" as she grew older, without need for medication or

counseling. Tr. 204. Andrus-Karker reported a "good family life" and that she received "good

family support" at home. Tr. 203. Andrus-Karker told Prescott that she was a "'hand-on' [*sic*]

learner and ha[d] problems with reading and math skills" and that "it [wa]s hard for her to focus

her attention for longer than 15 minutes as she gets distracted." Tr. 204. Notwithstanding her

self-report of daily life activities to the contrary, Andrus-Karker reported to Prescott that she

"ha[d] some cooking skills [and that] she and her sister kn[e]w how to cook and they cook[ed] on

the stove" and that "she [wa]s learning about money[,] . . . ha[d] never spent it irresponsibly[,]

[and both that] she would be able to manage it and [that] her parents [we]re letting her manage

money." Tr. 204. 205.

Prescott opined that Andrus-Karker's affect was in the normal range, that she did not appear to be depressed or anxious, that she "showed fairly good short term memory" and "was able to correctly report 5 out of 5 unrelated words after a 5 minute delay" and "could follow a simple 3 step instruction" among other memory tasks upon which she performed successfully. Tr. 205. Prescott further opined that Andrus-Karker "showed impairment with concentration" and "appeared to be of Borderline intellectual function," operating at "a 4th-5th grade reading level" with a "Full scale IQ of 73." Tr. 205-206. Prescott further opined that Andrus-Karker's results showed "significant [unspecified] maladaptive behaviors." Tr. 207. Prescott concluded that Andrus-Karker was "not likely to maintain employment without job support services." Tr. 208.

On November 9, 2011, Administration consulting psychologist Dorothy Anderson determined that Andrus-Karker suffered from a primary medically determinable impairment of borderline intellectual functioning and a secondary medically determinable impairment of anxiety disorders. Tr. 58. Anderson found that these impairments caused Andrus-Karker moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. Tr. 58. Anderson determined that, although Andrus Karker had marked limitations in her ability to understand and remember detailed instructions, was not able to understand and remember more complex, detailed tasks, had sustained concentration and persistence limitations, would not be able to complete detailed tasks successfully, and would not deal well with the demands of the general public on a frequent basis, she would nevertheless "be able to manage simple tasks and routines as long as she

Page 11 - FINDINGS AND RECOMMENDATION

receives supportive and fairly close supervision," and was "generally socially appropriate" and would "be able to get along with coworkers with some supervisor assistance." Tr. 58-61. Anderson determined that with "a predictable, encouraging work setting and frequent help in making reasonable work goals and assessing her progress and such goals" Andrus-Karker's adaptation limitations would not prevent her from sustaining employment. Tr. 61. On the basis of the foredescribed determinations, the Administration found that Andrus-Karker would be able to sustain unskilled employment, and found that she was not disabled for purposes of the Act. Tr. 62, 63. The Administration advised Andrus-Karker of its decision that she was not disabled for purposes of the Act on that same date, November 9, 2011. Tr. 64.

On December 6, 2011, Andrus-Karker requested reconsideration of the Administration's finding of non-disability. Tr. 82-85. Andrus-Karker reported no material change in her condition in connection with her request for reconsideration. Tr. 174-178.

On February 9, 2012, on reconsideration of Andrus-Karker's proffered evidence, Administration consulting psychologist Paul Rethinger opined that Andrus-Karker's residual functional capacity was consistent with Anderson's foredecribed opinion. Tr. 65-73. On that basis, the Administration affirmed on reconsideration that Andrus-Karker was not disabled by her borderline intellectual functioning and anxiety disorders. Tr. 74. The Administration notified Andrus-Karker of its decision on reconsideration on that same date, February 9, 2012. Tr. 76, 77-81, 86-88.

On March 12, 2012, Andrus-Karker requested a hearing before an Administrative Law Judge. Tr. 89-91.

Before the Administration set a date for such a hearing before an ALJ, Andrus-Karker

was examined by Qualified Mental Health Provider Nikki Ehrmantrout on June 4, 2012. Tr. 232-238. Ehrmantrout reported that Andrus-Karker was seeking treatment for depression and stress, specifically for "[i]ncreased sadness lasting all day at times, not eating very much, waking up early in the morning and unable to fall back to sleep, low self esteem, suicidal ideation ('not very often') and difficulty concentrating." Tr. 232. Ehrmantrout recorded that Andrus-Karker reported "[p]ast trauma ('I was choked by someone and my boyfriend just sat there') and . . . that someone tried to 'rape' her in middle school ('a friend of mine'), but 'I got away.'" Tr. 232. Ehrmantrout diagnosed Andrus-Karker with dysthymic disorder, social phobia, and post-traumatic stress disorder on Axis I (clinical disorders), with no diagnosis on Axis II (personality disorders and mental retardation), with dyslexia on Axis III (general medical conditions), and with mild educational and economic problems and moderate primary support group difficulties on Axis IV (psychosocial and environmental problems). Tr. 235-236.

Andrus-Karker met with Ehrmantrout's colleague Jennifer Blake, social worker, on June 13, 2012. Tr. 222-224. Blake and Andrus-Karker discussed a treatment plan designed to raise Andrus-Karker's self-esteem. Tr. 223. On November 30, 2012, Blake recorded that Andrus-Karker received individual therapy from her intake on June 4, 2012, through August 2012, but then stopped attending appointments. Tr. 219-221. Blake recorded that Andrus-Karker intended to resume seeing a therapist once again. Tr. 219-221.

On February 25, 2013, Andrus-Karker underwent an evaluation of her executive functioning regarding community transitions and connections. Tr. 200. On a scale of 1-3, where a 1 indicates that the evaluee rarely has the measured capacity and a 3 indicates that the evaluee often has the measured capacity, Andrus-Karker performed at either a 2 or a 3 on all measures.

Tr. 200.

On May 3, 2013, Andrus-Karker met with her therapist, psychologist Debra Alexander, complaining of stress and depressed mood. Tr. 216-218. Andrus-Karker's reported symptoms included "intrusive thoughts and images, hypervigilance, nightmares, avoidance and difficulty concentrating," as well as "restlessness, anxiety, tension, irritability, and sleep problems," and Andrus-Karker reported "life long depression, sleep problems, low self-esteem, self-harm behaviors 'off and on' and irritability." Tr. 216. Alexander reported diagnoses of Andrus-Karker's impairments identical to Ehrmantrout's diagnoses of June 13, 2012. Tr. 217.

On May 15, 2013, Andrus-Karker's grandmother, Jean A. Karker, provided a letter by and through which she testified that Andrus-Karker "ha[d] difficulty comprehending what people are saying to her and ha[d] difficulty expressing herself so that people can understand what she is trying to say to them," that she "ha[d] trouble reading and comprehending written words and, therefore, would have trouble reading and comprehending written instructions on the job or in life in general," that she "doesn't understand the importance of getting things done in a timely manner" or "that there is a consequence for not doing so," that she "starts doing something and then gets bored or distracted easily and usually doesn't want to finish it," and that "[a]ll these problems affect her in a negative way, causing her to need a lot of supervision on a daily basis. . . ." Tr. 199.

On May 17, 2013, Andrus-Karker again met with social worker Blake to discuss a treatment plan designed to raise her self esteem. Tr. 228-231.

On June 20, 2013, Andrus-Karker's grandmother, Dolores I. Andrus, provided a letter by and through which she testified that Andrus-Karker "ha[d] difficulty understanding social

situations and an inability to concentrate and make reasonable decisions." Tr. 201. On June 22,

2013, Andrus-Karker's aunt, Katherine Lawson, provided a letter by and through which she

testified that "the reading material that [Andrus-Karker] has had in her possession is far below a

level that would be normal for a woman of her age," that "the written correspondence [Lawson

and Andrus-Karker] have shared over the past seven years suggests . . . that [Andrus-Karker's]

writing skills and vocabulary are also far below what would be considered normal for someone

her age," that after reading instructions or rules, as for a board game, "she exhibits extreme

difficulty comprehending or applying what she has read," that "her attention span has not

improved to a level of the majority of people her age," and that she did not believe

Andrus-Karker "w[ould] ever be able to obtain a position in any career path that would enable

her to make enough income to become an independent adult." Tr. 202.

On July 10, 2013, a hearing was conducted before an ALJ in connection with Andrus-

Karker's SSI application. Tr. 25-54. Appearing at the hearing were Andrus-Karker and her

counsel, as well as a vocational expert. Tr. 25-54. At the hearing, Andrus-Karker testified in

relevant part that her impairments cause her to have difficulty in maintaining focus after working

"more than two hours or an hour at the most," Tr. 34, a problem in connection with which she

was receiving counseling which was helping, Tr.34-35, that she did not do much cooking and

that, when she did, it was "mostly microwavable stuff," Tr. 40, that when she is "not that

involved in" a task or if it is "boring to [her]," she "tend[s] to slack and not care" about finishing

the task, Tr. 41, that sometimes when performing a household chore she "just do[es]n't feel like

doing it" in which case someone else ends up doing it for her, Tr. 41-42, that she "normally"

finds herself "uncomfortable" or anxious talking to people she doesn't already know, Tr. 44, and

that she has on a couple of occasions experienced panic attacks after seeing a stranger who resembled someone who had traumatized her in the past, Tr. 45. The vocational expert provided testimony that a person twenty years old with a modified, special-education high school diploma and no past relevant work experience "capable of a full range of work" but "limited to simple, repetitive, routine tasks requiring no more than occasional interaction with supervisors, coworkers and the general public" would be capable of performing the obligations of jobs existing in significant numbers in the national and Oregon economies, including commercial or institutional cleaner, warehouse worker, and industrial sweeper/cleaner. Tr. 47, 48, 49. The vocational expert further testified that such a person, if "off task" or not "satisfactorily productive more than 10 percent of the time on a regular basis" would "be relegated to a shelter workshop." Tr. 49-51. The vocational expert declined to offer an opinion as to whether such an individual who required, in addition, "job support services" in order to "maintain employment" would be able to perform the obligations of jobs existing in significant numbers in the national and Oregon economies, on the ground that it was unclear what the term "job support services" meant in that context. Tr. 51-53.

On July 19, 2013, the ALJ denied Andrus-Karker's application for supplemental security income. Tr. 10-12, 13-21. Andrus-Karker timely requested review of the ALJ's decision, Tr. 7, and the Appeals Council denied her request on October 21, 2013, Tr. 1-3. In consequence, the ALJ's decision of July 19, 2013, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Andrus-Karker did not engage in substantial gainful activity at any time following her application date of June 23, 2011. Tr. 15. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Andrus-Karker's medical impairments of "borderline intellectual functioning and anxiety disorder" were "severe" for purposes of the Act. Tr. 15. The ALJ further found that Andrus-Karker's purported diagnoses of post-traumatic stress disorder, dysthymia, and social phobia by Qualified Mental Health Provider Nikki Ehrmantrout were not made by "an acceptable medical source under Social Security Ruling (SSR) 06-03p or CFR 416.913(a)," were "inconsistent with the claimant's reported activities of daily living, function report, hearing testimony and the evidence of the record generally," and were not consistent with Prescott's October 2011 report. Tr. 15. On that basis, the ALJ found that post-traumatic stress disorder, dysthymia, and social phobia were not "medically determinable impairments." Tr. 15. Because the impairments caused by Andrus-Karker's borderline intellectual functioning and anxiety disorder were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Andrus-Karker's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 15. The ALJ therefore properly conducted an assessment of Andrus-Karker's residual functional capacity. Specifically, the ALJ found that at all material times:

> [Andrus-Karker had] the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

Page 17 - FINDINGS AND RECOMMENDATION

> limited to simple, repetitive, routine tasks with no more than occasional
> interaction with supervisors, co-workers and the general public.

Tr. 17. In reaching this finding, the ALJ considered all of the material objective medical

evidence in the record, as well as all of the various witness statements regarding Andrus-Karker's

symptoms. Tr. 17-20.

At the fourth step of the five-step process, the ALJ found that Andrus-Karker had no past

relevant work. Tr. 20.

At the fifth step, the ALJ found in light of Andrus-Karker's age, education, work

experience, and RFC that there were jobs existing in significant numbers in the national and local

economy that she could perform. Tr. 20. In light of Andrus-Karker's RFC, the ALJ found that

pursuant to Medical-Vocational Rule 204 and the Medical-Vocational Guidelines, a finding of

"not disabled" was appropriate. Tr. 20-21. On that basis, the ALJ concluded that Andrus-Karker

was not disabled as defined in the Act at any time since June 23, 2011. Tr. 21.

## ANALYSIS

Andrus-Karker challenges the Commissioner's assessment of her residual functional

capacity. Specifically, Andrus-Karker argues that the Administrative Law Judge erred in

improperly rejecting a portion of the October 2011 opinion of examining psychologist Prescott,

in failing to credit a portion of the October 2011 assessment of OVRS counselor Lindsey, in

failing to address the February 2011 opinion of school psychologist Keyworth, in failing to give

clear and convincing reasons for the rejection of portions of Andrus-Karker's own testimony, and

in failing to credit portions of other lay witnesses' testimony. Andrus-Karker further argues that,

in light of the alleged errors in the ALJ's assessment of her RFC, the Commissioner failed to

carry her burden at the fifth step of the five-step process. Andrus-Karker takes the position that

Page 18 - FINDINGS AND RECOMMENDATION

the Commissioner's decision should, in consequence, be reversed and her case remanded to the

Administration for award of benefits.

The Commissioner concedes that the ALJ erred in mischaracterizing a portion of the

October 2011 assessment of OVRS counselor Lindsey, in improperly rejecting a portion of the

October 2011 opinion of examining psychologist Prescott, and in failing to address the February

2011 opinion of school psychologist Keyworth (and is silent as to whether the ALJ might have

committed error in connection with his assessment of Andrus-Karker's own testimony or that of

other lay witnesses). The Commissioner takes the position that the appropriate judicial response

to the ALJ's conceded errors is to reverse and remand for further proceedings.

The sole question now at issue before this court is whether remand should be for award of

benefits or for further proceedings.

> Usually, "[i]f additional proceedings can remedy defects in the original
> administrative proceeding, a social security case should be remanded." *Lewin v.*
> *Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). The Social Security Act, however,
> makes clear that courts are empowered to affirm, modify, or reverse a decision by
> the Commissioner "with or without remanding the cause for a rehearing." 42
> U.S.C. § 405(g) . . . . Accordingly, every Court of Appeals has recognized that in
> appropriate circumstances courts are free to reverse and remand a determination
> by the Commissioner with instructions to calculate and award benefits. . . .
> Courts have generally exercised this power when it is clear from the record that a
> claimant is entitled to benefits. . . .

*Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (bracketed modifications original;

original emphasis removed; some citations omitted). Accordingly, the Ninth Circuit has

developed a "three-part credit-as-true standard, each part of which must be satisfied in order for a

court to remand to an ALJ with instructions to calculate and award benefits:"

> (1) the record has been fully developed and further administrative proceedings
> would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient
> reasons for rejecting evidence, whether claimant testimony or medical opinion;

and (3) if the improperly discredited evidence were credited as true, the ALJ
would be required to find the claimant disabled on remand.

*Id.* at 1020 (citations omitted). Moreover, the *Garrison* court affirmed the rule, first expressly

articulated in *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), that where "evaluation of

the record as a whole creates serious doubt that a claimant is, in fact, disabled," courts are

*required* to remand for further proceedings rather than for award of benefits "even [where] all

[three] conditions of the credit-as-true rule are satisfied." *Garrison*, 759 F.3d at 1021.

For the reasons that follow, I agree with the Commissioner that remand for further

proceedings is appropriate here.

## I.    Andrus-Karker's Assignments of Error

### A.    October 2011 Assessment of OVRS Counselor Lindsey

As noted above, in October 2011 counselor Lindsey provided an evaluation of Andrus-

Karker's performance in the course of her employment by the Society of St. Vincent de Paul. Tr.

169-173. Lindsey opined that Andrus-Karker's job duties in connection with all three of the

positions she worked "appeared to be within [her] physical and mental capabilities," Tr. 170, that

Andrus-Karker performed at or near the community standard in most measures of interest to

employers, Tr. 170-172, and that she "demonstrate[d] many strengths to offer an employer," Tr.

172, including reliability, punctuality, enthusiasm, flexibility, and resilience, Tr. 172, but also

opined that her "productivity and quality [we]re not competitive[,] . . . due to her inexperience in

work as well as her Learning Disability and [unspecified] barriers to employment," Tr. 173,

ultimately recommending that she "look for work that is repetitive and [in which] speed can be

increased over time," Tr. 173, and concluding that she would "benefit from Supported

Employment services for ongoing job coaching and retention," Tr. 173. The ALJ summarized

Page 20 - FINDINGS AND RECOMMENDATION

Lindsey's evaluation largely correctly and accurately, Tr. 18, but patently erred in asserting that "it was . . . Lindsey's opinion that the claimant would work well competitively," Tr. 18. Andrus-Karker argues that Lindsey's conclusion that her productivity and quality were not competitive is competent, probative evidence of how her impairments affect her ability to work that should be credited as true by this court, and that, if credited as true, would mandate remand for award of benefits. The Commissioner agrees that the ALJ's assertion was erroneous, but argues generally that remand should be for further proceedings because the record contains unresolved issues requiring further development and because the record does not clearly establish Andrus-Karker's disability.

Under applicable Administration regulations, Lindsey falls within the category of "[p]ublic and private social welfare agency personnel" and is treated as an "other source" rather than as any type of "acceptable medical source." 20 C.F.R. § 404.1513(a), (d); *see also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-1224 (9th Cir. 2010). Under 20 C.F.R. § 404.1512(e), the ALJ was required to consider and not to disregard Lindsey's "other source" testimony in assessing Andrus-Karker's mental RFC, *see* 20 C.F.R. § 404.1513(e), *see also Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), unless he expressly offered "germane" reasons for so doing, *Turner*, 613 F.3d at 1224, *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). As indicated above, it is undisputed that the ALJ offered no reasons for his fundamental misconstrual of Lindsey's opinion that Andrus-Karker's productivity and quality of work were "not competitive." I agree with the parties that the ALJ's misconstrual of that portion of Lindsey's opinion constituted error.

**B.      October 2011 Opinion of Examining Psychologist Prescott**

Also as noted above, in October 2011 Andrus-Karker was examined by psychologist

Prescott. Tr. 203-209. Prescott opined that Andrus-Karker's affect was in the normal range, that

she did not appear to be depressed or anxious, that she "showed fairly good short term memory"

and "was able to correctly report 5 out of 5 unrelated words after a 5 minute delay" and "could

follow a simple 3 step instruction" among other memory tasks upon which she performed

successfully, Tr. 205, but further opined that she "showed impairment with concentration" and

"appeared to be of Borderline intellectual function," operating at "a 4th-5th grade reading level"

with a "Full scale IQ of 73," Tr. 205-206, that her results showed "significant [unspecified]

maladaptive behaviors," Tr. 207, and that she was "not likely to maintain employment without

job support services," Tr. 208.  The ALJ summarized Prescott's opinion accurately, Tr. 18-19, but

rejected Prescott's opinion that Andrus-Karker was not likely to maintain employment without

job support services as "not supported by the full evidence of record, which indicates that the

claimant is capable of work tasks when her functional limitations are accommodated," Tr. 19.

The parties appear to agree that the referenced "evidence of record" indicating Andrus-Karker's

capacity to perform work tasks "when her functional limitations are accommodated" included or

may have included the ALJ's misconstrual, discussed above, of counselor Lindsey's opinion

regarding Andrus-Karker's productivity and quality of work.  Andrus-Karker argues that if the

rejected portion of Prescott's opinion were credited as true, a finding of disability would be

required.  The Commissioner, by contrast, concedes that it is unclear whether the ALJ's rejection

was based on an accurate construal of record evidence, but argues that remand should be for

further proceedings because the record contains unresolved issues requiring further development

and because the record does not clearly establish Andrus-Karker's disability.

To reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing" reasons for doing so. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005), *citing Lester*, 81 F.3d at 830-831. If a treating or examining physician's opinion is in conflict with substantial medical evidence or with another physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id.* I agree with the parties that to the extent the ALJ's rejection of a portion of Prescott's opinion may have been premised on his patent misconstrual of Lindsey's opinion, it was not based on either clear and convincing or specific and legitimate reasons, and therefore to that extent constituted error.

## C.    February 2011 Opinion of School Psychologist Keyworth

Also as noted above, in February 2011 school psychologist Keyworth administered an IQ test and an individual achievement test on Andrus-Karker. Tr. 255-259. Keyworth opined that Andrus-Karker's "cognitive ability [wa]s in the Borderline range compared to same-age peers, suggesting that she may experience difficulty in keeping up with her peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities," Tr. 259, that her "academic skills [we]re in the Borderline-Extremely Low range when compared to same-age peers," Tr. 259, and that "[i]t appears that [Andrus-Karker] will continue to require a great deal of support and supervision to develop functional vocational skills and independent living skills," Tr. 259. The ALJ failed to address Keyworth's opinion in his opinion. Andrus-Karker argues that Keyworth's opinion should therefore be credited as true, and suggests that, if so credited, her opinion would mandate a finding of disability. The Commissioner argues that remand for further proceedings is instead appropriate because the record contains unresolved issues requiring further

development and because the record does not clearly establish Andrus-Karker's disability.

Keyworth, a school psychiatrist with a Master's degree in psychology, qualifies as an "acceptable medical source" for purposes of the Act. 20 C.F.R. 404.1513(a)(2). Under 20 C.F.R. § 404.1512(e), the ALJ was required to consider and not to disregard Keyworth's opinion in assessing Andrus-Karker's mental RFC. *See* 20 C.F.R. § 404.1513(e). I therefore agree with the parties that it was clear error for him to fail to do so.

### D.    Andrus-Karker's Testimony

Also as noted above, in connection with her application for supplementary security income benefits, Andrus-Karker characterized the impairments caused by her learning disability as limiting her ability to work  because she is "slow at learning," "get[s] confused easily," "pos[s]ibly d[y]slexic," and has a "short at[t]ention span," Tr. 148, and reported limitations in memory, completing tasks, concentration, understanding, and following written instructions, Tr. 153. Also as noted above, at the July 10, 2013, hearing before the ALJ, Sndrus-Karker testified that her impairments cause her to have difficulty in maintaining focus after working "more than two hours or an hour at the most," Tr. 34, a problem in connection with which she was receiving counseling which was helping, Tr.34-35, that when she is "not that involved in" a task or if it is "boring to [her]," she "tend[s] to slack and not care" about finishing the task, Tr. 41, that sometimes when performing a household chore she "just do[es]n't feel like doing it" in which case someone else ends up doing it for her, Tr. 41-42, that she "normally" finds herself "uncomfortable" or anxious talking to people she doesn't already know, Tr. 44, and that she has on a couple of occasions experienced panic attacks after seeing a stranger who resembled someone who had traumatized her in the past, Tr. 45. The ALJ found that Andrus-Karker's

impairments "could reasonably be expected to cause [her] alleged symptoms," Tr. 18, but further

found that "the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely credible for the reasons explained in this decision," Tr. 18. As

Andrus-Karker correctly notes, the ALJ did not expressly base his partially negative assessment

of Andrus-Karker's credibility on any of the specific "reasons explained in []his decision."

Andrus-Karker argues that his failure to do so constituted error, and moreover that he in any

event could not have done so because her testimony was fully supported by the medical evidence

of record. Andrus-Karker takes the position that her testimony should be fully credited,

mandating remand for award of benefits. The Commissioner fails to address Andrus-Karker's

assignment of error in the ALJ's assessment of her credibility.

When a claimant's medical record establishes the presence of a "medically determinable

impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other

symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those

symptoms. 20 C.F.R. § 404.1529. In the event the ALJ determines that the claimant's report is

not credible, such determination must be made "with findings sufficiently specific to permit the

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.

Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46

(9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's

reputation for truthfulness, inconsistencies either in claimant's testimony or between her

testimony and her conduct, claimant's daily activities, her work record, and testimony from

physicians and third parties concerning the nature, severity, and effect of the symptoms of which

claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792

(9th Cir. 1997).  While a finding that a claimant lacks credibility cannot be premised solely on a

lack of medical support for the severity of the claimed symptoms, *see Light*, 119 F.3d at 792,

*citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is

supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278

F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Partially in light of the Commissioner's failure to address Andrus-Karker's assignment of

error in the ALJ's partially negative assessment of her credibility, I assume *arguendo* that the

ALJ's credibility determination was based on findings so unspecific as to constitute error under

*Thomas* and *Bunnell*.

### E.    Other Lay Witness Testimony

Also as noted above, on May 15, 2013, Andrus-Karker's grandmother, Jean A. Karker,

provided a letter by and through which she testified that Andrus-Karker "ha[d] difficulty

comprehending what people are saying to her and ha[d] difficulty expressing herself so that

people can understand what she is trying to say to them," Tr. 199, that she "ha[d] trouble reading

and comprehending written words and, therefore, would have trouble reading and

comprehending written instructions on the job or in life in general," Tr. 199, that she "doesn't

understand the importance of getting things done in a timely manner" or "that there is a

consequence for not doing so," Tr. 199, that she "starts doing something and then gets bored or

distracted easily and usually doesn't want to finish it," Tr. 199, and that "[a]ll these problems

affect her in a negative way, causing her to need a lot of supervision on a daily basis," Tr. 199, on

June 20, 2013, Andrus-Karker's other grandmother, Dolores I. Andrus, provided a letter by and

through which she testified that Andrus-Karker "ha[d] difficulty understanding social situations

and an inability to concentrate and make reasonable decisions," Tr. 201, and on June 22, 2013,

Andrus-Karker's aunt, Katherine Lawson, provided a letter by and through which she testified

that "the reading material that [Andrus-Karker] has had in her possession is far below a level that

would be normal for a woman of her age," Tr. 202, that "the written correspondence [Lawson and

Andrus-Karker] have shared over the past seven years suggests . . . that [Andrus-Karker's]

writing skills and vocabulary are also far below what would be considered normal for someone

her age," Tr. 202, that after reading instructions or rules, as for a board game, "she exhibits

extreme difficulty comprehending or applying what she has read," Tr. 202, that "her attention

span has not improved to a level of the majority of people her age," Tr. 202, and that she did not

believe Andrus-Karker "w[ould] ever be able to obtain a position in any career path that would

enable her to make enough income to become an independent adult," Tr. 202. The ALJ expressly

stated that he took the three letter reports into consideration in assessing Andrus-Karker's mental

RFC, Tr. 20, and that all three letter reports were found "credible as to their reported

observations," Tr. 20, but that "where not corroborated by the full record" the letter reports were

"not given significant weight," Tr. 20. After reviewing the letter reports, the ALJ stated that

Andrus-Karker was "limited to simple routine tasks [and] occasional contact with the public, co-

workers and supervisors." Tr. 20. Andrus-Karker argues that the ALJ's consideration of the lay

testimony provided by Andrus-Karker's grandmothers and aunt was "incomplete and inadequate"

and erroneous to the extent he may have discredited testimony regarding her attention span,

distractibility, need for supervision, and difficulties with comprehension as inconsistent with

medical evidence of record. She takes the position that the lay testimony should be credited as

Page 27 - FINDINGS AND RECOMMENDATION

true, mandating remand for award of benefits. The Commissioner fails to address Andrus-Karker's assignment of error in the ALJ's assessment of her lay witnesses' credibility.

An ALJ must consider the statements of non-medical sources in a position to observe a claimant's symptoms and daily activities. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Such lay witnesses are competent to testify regarding the claimant's condition. *See Dodrill*, 12 F.3d at 918. Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *See id.*; *see also, e.g., Bayliss*, 427 F.2d at 1218; *Lewis*, 236 F.3d at 511.

Partially in light of the Commissioner's failure to address Andrus-Karker's assignment of error in the ALJ's partially negative assessment of the lay witnesses' testimony, I assume *arguendo* that the ALJ's proffered reasons for his determination were not sufficiently germane to satisfy the standard articulated in *Nguyen, Bayliss*, and *Lewis*, and therefore constituted error.

## II.    Application of the Credit-as-True Standard

Whether considered separately or collectively, the Commissioner's adoption of the ALJ's errors in improperly characterizing or discrediting the evidence discussed above require remand for further proceedings rather than for calculation and award of benefits under the credit-as-true standard, in that even if credited as true, the mischaracterized or discounted evidence would not have required the ALJ to find Andrus-Karker disabled. As to the Commissioner's error in adopting the ALJ's misconstrual of Lindsey's opinion, I note that Lindsey did not opine that Andrus-Karker's noncompetitive productivity and quality of work were in sole consequence of

her learning disability but rather were caused by her learning disability, her general inexperience

with work, and additional, unspecified barriers to employment, which may have included

Andrus-Karker's social anxieties but may instead or in addition have included factors such as

logistic difficulties in relying on public transportation to travel to her work site. To the extent

that Lindsey's opinion regarding the competitiveness of Andrus-Karker's productivity and quality

was premised on Andrus-Karker's inexperience with work or any logistic or other non-medical

issue, it does not provide support for the conclusion that Andrus-Karker is disabled by her

borderline intellectual functioning and/or anxiety disorder. Thus, even if Lindsey's misconstrued

opinion were credited as true, the ALJ would not have been required to find Andrus-Karker

disabled, but rather could reasonably have concluded that Andrus-Karker's productivity and

quality could be improved to meet community standards through increased familiarity with work

and/or through removing barriers to employment unrelated to her medical condition.

As to the Commissioner's adoption of the ALJ's rejection of a portion of Prescott's

opinion, I similarly note that Prescott did not opine that Andrus-Karker was *unable* to sustain

gainful employment, an opinion which, if credited as true, would require a finding of disability,

but rather only that she was "*not likely* to maintain employment *without job support services*"

(emphasis supplied), an opinion which, if credited as true, might provide support for a finding of

disability but falls well short of compelling such a finding. The phrase "not likely" does not

imply impossibility, and the undefined qualifying phrase "without job support services" is

ambiguous as to how significant, intrusive, and/or inconvenient an accommodation of Andrus-

Karker's functional limitations would be required in order to permit her to maintain gainful

employment. Thus, even if the improperly rejected portion of Prescott's opinion were credited as

true, the ALJ would not have been required to find Andrus-Karker disabled, but rather could reasonably have concluded that Andrus-Karker could, albeit with a degree of difficulty, maintain gainful employment.

As to the Commissioner's error in adopting the ALJ's conclusions notwithstanding the ALJ's failure to address Keyworth's opinion, I similarly note that Keyworth did not opine that Andrus-Karker's impairments caused her to be *unable* to develop the "functional vocational skills" required to sustain gainful employment, but rather only that it appeared that she would "require a great deal of support and supervision" in order to develop those skills. If support and supervision could be sufficient to foster the requisite functional vocational skills in Andrus-Karker, it follows that her impairments were not so severe as to foreclose their development. In consequence, even if Keyworth's opinion were credited as true, the ALJ would not have been required to find Andrus-Karker disabled, but rather could reasonably have concluded that Andrus-Karker had the capacity to develop the functional vocational skills requisite to sustaining substantial employment.

As to the Commissioner's presumed error in adopting the ALJ's partially negative assessment of Andrus-Karker's credibility, I find that Andrus-Karker did not testify to impairments so severe as to prevent her from maintaining unskilled employment, but rather to impairments that would make it difficult for her to maintain such employment: testimony that, even if credited as true, would fall short of establishing her disability. That is, a person who experiences difficulty in maintaining focus after more than one or two hours, who has trouble generating motivation to complete boring or distasteful tasks, and who becomes uncomfortable or anxious when talking to strangers may still be able to maintain substantial employment in a

position requiring her to perform only simple, repetitive, routine tasks with no more than occasional interactions with supervisors, co-workers, or the general public, even if such person is also slow at learning, easily confused, and slow at reading.  In consequence, even if Andrus-Karker's testimony were credited as true, the ALJ would not have been required to modify his assessment of her mental RFC.

As to the Commissioner's presumed error in adopting the ALJ's partial discount of the other lay witnesses' credibility, I similarly find that the witnesses did not testify to impairments inconsistent with the ALJ's assessment of Andus-Karker's mental RFC.  A person with the short attention span, ease of distractibility, need for supervision to keep her from abandoning uncompleted tasks and difficulties with comprehension testified to by Andrus-Karker's witnesses would not be clearly unable to maintain substantial employment in a position requiring her to perform only simple, repetitive, routine tasks with no more than occasional interactions with supervisors, co-workers, or the general public.  In consequence, even if the lay witness testimony were credited as true, the ALJ would not have been required to modify his assessment of Andrus-Karker's mental RFC.

Collective consideration of the various errors provides no grounds for modification of the foregoing conclusions.  Andrus-Karker and the lay witnesses did not testify to impairments the ALJ failed to capture in his assessment of Andrus-Karker's mental RFC, and Lindsey, Prescott, and Keyworth did not opine as to discrete, independent incapacities whose collective impact on Andrus-Karker's RFC might potentially be greater than that of any one considered separately, but rather to closely related difficulties Andrus-Karker would be required to overcome in order to sustain substantial employment.  In light of all of the foregoing, I find that remand for further

proceedings rather than for award of benefits is appropriate under the credit-as-true standard.

### III.   *Connett* Flexibility

Moreover, even if the court were to conclude that all three elements of the credit-as-true standard were satisfied by any of the foredescribed errors considered either singly or collectively, remand for further proceedings would nevertheless be appropriate under the *Connett* flexibility rule, pursuant to which the courts of the Ninth Circuit are "requir[ed] . . . to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.  Specifically, I find that (i) Lindsey's opinion that Andrus-Karker's job duties in connection with all three of the positions she worked at St. Vincent de Paul "appeared to be within [her] physical and mental capabilities," Tr. 170, that Andrus-Karker performed at or near the community standard in most measures of interest to employers, Tr. 170-172, and that she "demonstrate[d] many strengths to offer an employer," Tr. 172, including reliability, punctuality, enthusiasm, flexibility, and resilience, Tr. 172, (ii) Anderson's November 9, 2011, opinion that Andrus-Karker would "be able to manage simple tasks and routines as long as she receives supportive and fairly close supervision," and was "generally socially appropriate" and would "be able to get along with coworkers with some supervisor assistance," Tr. 58-61, and that with "a predictable, encouraging work setting and frequent help in making reasonable work goals and assessing her progress and such goals" Andrus-Karker's adaptation limitations would not prevent her from sustaining employment. Tr. 61, (iii) psychologist Rethinger's consistent opinion of February 9, 2012, Tr. 65-73, (iv) Andrus-Karker's self-report of vigorous daily activities and capacity to perform tasks, Tr. 148-153, (v) psychologist Alexander's finding that

Andrus-Karker suffered only from "mild educational impairments and moderate primary support group difficulties," Tr. 216-218, and (vi) school psychologist Keyworth's opinion that, albeit with significant work, Andrus-Karker would be able to "develop functional vocational skills and independent living skills," Tr. 259, create serious doubt that Andrus-Karker would be unable to sustain any form of unskilled employment even when considered together with (vii) Lindsey's opinion that her productivity and quality of work were not competitive, Tr. 172-173, (viii) Prescott's opinion that she suffered from "significant maladaptive behaviors," Tr. 207, and was "not likely to maintain employment without job support services," Tr. 208, (ix) Keyworth's opinion that "a great deal of support and supervision" would be required for her to "develop functional vocational skills and independent living skills," Tr. 259, and (x) lay witness testimony regarding her short attention span, distractibility, need for supervision, and difficulty in understanding instructions, Tr. 148-155, 156-163, 199, 201. Evaluation of the record as a whole suggests that Andrus-Karker suffers from no physical impairments and from mental impairments that would present challenges for any similarly situated claimant in sustaining substantial employment without rendering such employment impossible. In consequence, even if all three conditions of the credit-as-true rule were satisfied, remand for award of benefits would be inappropriate.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Andrus-Karker's application for supplemental security income should be reversed, and Andrus-Karker's action should be remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). A final judgment should be prepared.

Page 33 - FINDINGS AND RECOMMENDATION

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 1st day of April, 2015.

Honorable Paul Papak
United States Magistrate Judge